BRYAN SCHRODER
United States Attorney

WILLIAM A. TAYLOR
JAMES KLUGMAN
Assistant United States Attorney
Federal Building & U.S. Courthouse
222 West Seventh Avenue, #9, Room 253
Anchorage, Alaska 99513-7567
Phone: (907) 271-5071
Fax: (907) 271-1500
Email: william.taylor@usdoj.gov
Email: james.klugman@usdoj.gov

CHAD W. MCHENRY
Trial Attorney
Organized Crime & Gang Section
U.S. Department of Justice
Email: chad.w.mchenry@usdoj.gov

Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　　　　Plaintiff,<br><br>　vs.<br><br>GLEN BALDWIN, a/k/a "GLEN DOG",<br>ROY NAUGHTON, a/k/a "THUMPER",<br>COLTER O'DELL, and<br>CRAIG KING, a/k/a "OAKIE",<br><br>　　　　　　　Defendants. | No. 3:19-cr-00026-TMB-DMS |

**OPPOSITION TO "MOTION TO COMPEL PRESENCE OF DEFENSE EXPERT DURING THE GOVERNMENT'S DESTRUCTIVE DNA TESTING."**

## I. Introduction

The defendants in this case kidnapped, assaulted, and murdered Michael Staton in August 2017. Crime scene technicians from the Alaska Department of Public Safety's Scientific Crime Detection Laboratory seized evidence from a duplex in Wasilla where Staton was beaten and from the Chevrolet Tahoe that defendants Glen Baldwin and Colter O'Dell used to transport him after the beating. Preliminary screening by the laboratory has concluded that some of this evidence may be suitable for forensic DNA testing, and the state laboratory is willing to perform this analysis if the government requests it. Because of the degraded nature of some of the samples, it may be necessary to completely consume the samples taken from the crime scenes in order to have meaningful testing.

The defendants appear to acknowledge that there is no basis to preclude the government from consuming the evidence in pursuit of this analysis. However, he moves this Court for an order requiring the presence of a defense expert during the process. Because this request would directly conflict with the laboratory's written Quality Assurance Policy regarding the presence of outside personnel, and the defendants have sufficient alternative methods to attack the results of the tests, this motion should be denied.

## II. Discussion

### 1. The nature of the testing at issue

The ultimate goal of forensic DNA analysis is to construct a series of DNA profiles – measurements of the frequency of alleles at certain specific points (called "loci") on a DNA strand – and to compare the profiles obtained from evidentiary samples and samples collected from

U.S. v. Fuhrer et al.
3:19-cr-00026-TMB-DMS

specific known individuals. If the profiles differ at any loci, the known individual can be excluded as the source of the questioned DNA, while if the profiles match at every locus, the individual cannot be excluded, and based on the statistical frequency of the measured combination of alleles, the analyst can offer an estimate of the likelihood that the known and questioned sample were produced by different persons. In short tandem repeat or STR testing, profiles consist of 20 core loci on the nuclear DNA strand: this testing is so discriminating that a failure to exclude a known sample can be considered a match. Short tandem repeat on the Y chromosome, or Y-STR testing, is less discriminating and can only be used on male DNA, but can generate usable profiles from smaller amounts of DNA, or on samples with a complex mixture of male and female DNA.

Both types of analysis consist of a four step process: *extraction*, where DNA is obtained from the evidence; *quantification*, where the analyst determines how much DNA is present; *amplification*, where the DNA is increased in order to be analyzed; and *genotyping*, where the analyst constructs a profile from the amplified DNA extract.

All of the known samples and all but one of the questioned samples in this case began as sterile swabs. (The remaining sample is a piece of carpeting.) These samples will be placed into microcentrifuge tubes which will then be processed through a series of sophisticated scientific instruments.



*A QIAGEN QIAcube sample processing platform used in the extraction step*



*An Applied Biosystems 7500 PCR system used in the quantification step*

U.S. v. Fuhrer et al.
3:19-cr-00026-TMB-DMS



*An ABI Geneamp 9700 PCR thermocycler used in the amplification step*



*An Applied Biosystems 3500xL Genetic Analyzer used in the genotyping step*

U.S. v. Fuhrer et al.
3:19-cr-00026-TMB-DMS

## 2. Relevant legal authority

In *California v. Trombetta*, 467 U.S. 479 (1984), the Supreme Court considered whether California's failure to preserve breath samples taken in the course of DUI breath tests was a due process violation that did not "comport with prevailing notions of fundamental fairness," by giving a criminal defendant "a meaningful opportunity to present a complete defense." *Id.*, 467 U.S. 479, 485 (1984). The Court held that California was not required to take and preserve the breath samples, because such evidence was not "expected to play a significant role in the suspect's defense." *Id.* at 488. "To meet this standard of constitutional materiality ... evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *Id.* at 489. The Court found that preservation of breath samples failed to meet this two-part test, because 1) evidence on the breathalyzer's accuracy, as designed and maintained, led to the conclusion that "[o]nce the Intoxilyzer indicated that respondents were legally drunk, breath samples were much more likely to provide inculpatory than exculpatory evidence," *id.*, and 2) the defendants could challenge the reliability of the Intoxilyzer in other ways, such as by alleging faulty calibration or by attempting to expose operator error by "cross examin[ing] the law enforcement officer who administered the test, and attempt to raise doubts in the mind of the factfinder whether the test was properly administered". *Id.* at 490.

Later, in *Arizona v. Youngblood*, 488 U.S. 51 (1988), the Supreme Court held there is no due process violation for destruction or failure to preserve evidence unless there is

bad faith on the part of the government. "We therefore hold that unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." *Id.* at 58. Applying this principle, courts have consistently found that the government is permitted to consume DNA samples when doing so is necessary in order to carry out forensic testing. *See*, e.g., *United States v. Kingsbury*, 317 F. Supp. 3d 476, 480 (D.D.C. 2018) ("For the foregoing reasons, the Court joins every other judge in this district to have considered the issue and holds that the government may consume the DNA swabs at issue in this case in conducting DNA testing."); *United States v. Davis*, 491 Fed. Appx. 219, 222-23 (2nd Cir. 2012) (no due process violation in consuming the entire DNA sample during the testing process). Accordingly, the government could have in good faith performed this testing – and consumed the samples – before indictment, without notifying the defendants at all.

The government deferred testing until the last known sample was obtained (from Glen Baldwin, who remained at large until after the indictment was returned). And rather than rushing to complete the testing and depriving counsel the ability to be heard before any testing, the government outlined the proposed testing protocol, and arranged conferences with between defense counsel and the forensic scientists. See ECF No. 209 at 7-10. In their motion the defendants appear to agree that there is no basis to preclude the testing altogether.

However, the defendants request to have an outside expert present in the laboratory for the testing process. The problem with this request is that the state will not accommodate

it because it violates the establish quality control policy. This is not an arbitrary diktat meant to frustrate a vigorous defense: it is designed to ensure scientifically reliable and valid results in a variety of forensic disciplines. As explained in the Department of Public Safety's 51 page Quality Assurance Manual:

> **Policy 2 Independent Experts or Experts in Laboratory Facilities**
>
> 1. Attorneys or independent experts (non-Laboratory employees) are not permitted to perform or view scientific examinations in Crime Laboratory areas. The reasons for this policy are as follows:
> **A. Liability** - Outside personnel are not familiar with the Crime Laboratory, its potential hazards, safety rules, OSHA mandated Chemical Hygiene Plan**,** Exposure Control Plan, and specific equipment operation.
> **B. Security** - Outside personnel would be disruptive to the normal work routine since all other regular case work would have to be stopped and secured while they were using the facility. To do otherwise would undoubtedly raise questions and possible objections on other cases. Laboratory security requires a continuous escort for visitors. Valuable examination time would be lost by Laboratory personnel providing this escort service.
> **C. Property Damage** - The Laboratory utilizes a myriad of sophisticated instrumentation. State funding has been provided to ensure that Laboratory personnel can operate this equipment in a proper manner. It would be impossible to determine the competency of others prior to their use of the Laboratory's specific make and model of instrumentation.
> **D. Fiscal Responsibility** - Use of state equipment by outside experts would prevent its use for current case examination by Laboratory personnel. It must be realized that private experts represent a commercial and often lucrative enterprise. Therefore, it should be incumbent upon them to provide their own equipment and supplies, rather than having state facilities made available to them at the State's expense.
> **E.** Defense attorneys have the right under the Alaska Rules of Criminal Procedure to have evidence reanalyzed at a laboratory of their choice, rather than disrupting Laboratory operations.

In other words, this policy is designed to maintain the scientific reliability of the results for *all* testing undertaken in the laboratory. These sorts of quality assurance policies

ensure the scientific reliability of the testing procedures, and thus the admissibility of the results in court.[1]

While in this case it is true that some of the DNA samples will be consumed, as discussed further below, there is still ample ability to re-test, analyze, cross examine, and otherwise attempt to challenge the results.

The defendants claim that courts "routinely allow defense experts to be present" for this sort of testing. ECF No. 209 at 4-5. But the defendants offer only a single footnote in a district court opinion to support of this positon. *United States v. Anderson*, 196 F.Supp.3d 60 at n. 3 (D.D.C. 2016). Indeed, it does not appear that the defendant in *Anderson* even requested to have experts present: the judge simply noted that she believed that such an arrangement would be appropriate if it were sought. Similarly, there is no indication that the government opposed this proposal, or that the laboratory had a policy that would preclude it. The defendants have provided *no* examples of cases where the court entered such an order over such opposition – much less any evidence that courts do so "routinely". On the contrary, at least one district court has found that "it is unnecessary for defendant's expert to be present during the testing because it would not materially aid the defendant in challenging the reliability of the test. Defendant retains the ability to challenge the testing procedures by cross examining the government's expert or by impeaching the reliability of her methods." *United States v. Rogers*, 2010 WL 5015329 at *1 (D. Kan. Dec. 3, 2010).

---

[1] In addition to the concerns for this case, it is unclear of an outside expert for one case, would need to be disclosed with the resulting of testing that occurred in other cases – most of which will be handled by in state court by state prosecutors and investigators.

U.S. v. Fuhrer et al.
3:19-cr-00026-TMB-DMS

Page 9 of 13
Case 3:19-cr-00026-TMB   Document 217   Filed 07/31/19   Page 9 of 13

The same logic obtains here. The defendants have ample means to challenge the results of any DNA test the Government performs. The defendants have already received discovery of the reports and bench notes produced by the analysts so far, and will receive similar work product from any and all subsequent testing. They "will have the ability to cross-examine the DNA analyst, [and] will be able to call an expert to impeach the analyst, the testing procedure, and the results." *United States v. Roach*, 2007 WL 2318872, at *2 (D. Kan. Aug. 13, 2007). This offers far more opportunity to meaningfully attack any issues with the testing – particularly in light of the minimal information that visual observation of the testing process will be able to provide.

Moreover, the defendants still could have an expert redo much of the government's analysis. The defendants' experts can take a DNA sample from their respective clients, conduct independent testing, and then compare that sample to any DNA profile the Government creates from the DNA swabs taken from the crime scene. As the Supreme Court recognized in *Trombetta*, defendants who can "cross-examine" the test administrator and perform some independent analysis have "alternative means of demonstrating their innocence." 467 U.S. at 490. See also, *Trevino v. Dahm*, 2 F.3d 829, 832 (8th Cir. 1993) ("There is no due process violation when the defendant has an adequate opportunity to impeach the reliability of a scientific test and the qualifications of the individual administering the test if the government failed, in good faith, to preserve a sample for testing.") Additionally, the United States will preserve any additional samples which the

analyst determines she does not need to fully consume and will make them available for further testing.

The defendants have failed to show how having their own expert witness the DNA extraction occurring is necessary to preserve his due process rights. He has not identified an expert, nor provided any information on why cross examination would insufficient. This situation is very similar to the breathalyzer test in *Trombetta*, where the Supreme Court found there were sufficient avenues for the defendant to attack the results of the test. Here, the defendant wants to undermine this quality assurance with no identifiable reason.

The defendants also claim that the government wants the testing process to remain secret. ECF No. 209 at 4. This is patently untrue. As noted above, the defendants have already received extensive discovery about the testing undertaken, and the government will continue to provide additional materials as they are created. The government provided a thorough explanation of the samples the government would be testing. The laboratory is also extremely transparent about how it operates: all of its policies, protocols, and testing manuals are available on its website, https://dps.alaska.gov/Comm/CrimeLab/Home. The analysts have already met for a conference with defense counsel, and remain available and willing to do so again at their convenience. The policy at issue here is reasonably designed to maintain a sterile and controlled laboratory environment in order to promote reliable and effective science, not to obfuscate or cloak the operations of the laboratory in a cloud of secrecy.

Finally, the defendants argue that failure to have a defense expert present during the testing is "bad faith". They provide no support for this conclusory assertion. "Bad faith on the part of authorities involves malice or a design to seek an unconscionable advantage over the defendant." *Canez v. Spearman*, 2018 WL 1801943, at *11 (E.D. Cal. Apr. 13, 2018) (internal quotations omitted). "*Youngblood*'s bad faith requirement dovetails with the first part of the *Trombetta* test: that the exculpatory value of the evidence be apparent before its destruction." *United States v. Cooper*, 983 F.2d 928, 931 (9th Cir. 1993). That is simply not the case here, where the government has scrupulously worked to protect the defendants' access to the materials, and where the government's objection here is based on a neutral and reasonable policy from the laboratory.

Moreover, while this court certainly has the ability to impose conditions that limit or restrict the government's actions in this case, its authority over the Department of Public Safety is more circumscribed. Because the laboratory is controlled by the state of Alaska, and not the federal government, the laboratory can cease its cooperation at its discretion: neither the government nor this court has the ability to order the state agency to ignore its own policies in the course of its cooperation. *New York v. Printz*, 521 U.S. 898 (1997). Accordingly, this is not a situation where the government can simply choose whether or not to accommodate the defendants' preferences: as a practical matter, granting the motion may preclude any testing from taking place altogether.

U.S. v. Fuhrer et al.
3:19-cr-00026-TMB-DMS
Page 12 of 13
Case 3:19-cr-00026-TMB   Document 217   Filed 07/31/19   Page 12 of 13

In light of the highly probative potential of this testing, the limited utility that the presence of defense expert would offer, and the laboratory's established quality assurance policy, the defendants' motion should be denied.

### III. Conclusion

Based on the arguments presented above, the Court should deny the motion to require the Alaska State Crime lab to have an outside expert present in the laboratory during the DNA testing process.

RESPECTFULLY SUBMITTED July 31, 2019 at Anchorage, Alaska.

BRYAN SCHRODER
United States Attorney

/s James Klugman
JAMES KLUGMAN
Assistant U.S. Attorney
United States of America

**CERTIFICATE OF SERVICE**

I hereby certify that on July 31, 2019
a true and correct copy of the foregoing
was served electronically on the following:

Brent Hart
Peter Mazzone
Cassandra Stamm
Bradly A. Carlson

/s James Klugman
Office of the U.S. Attorney

U.S. v. Fuhrer et al.
3:19-cr-00026-TMB-DMS

Page 13 of 13
Case 3:19-cr-00026-TMB   Document 217   Filed 07/31/19   Page 13 of 13